```
              UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
                   ATLANTA DIVISION


KURTIS JEWELL,                  )
                                )
       PLAINTIFF,               )
                                ) DOCKET NO. 1:12-CV-0563-AT
       -VS-                     )
                                )
AARON'S, INC.,                  )
                                )
       DEFENDANT.               )



      TRANSCRIPT OF CONDITIONAL CLASS CERTIFICATION MOTION
            BEFORE THE HONORABLE AMY TOTENBERG
            UNITED STATES DISTRICT COURT JUDGE
                WEDNESDAY, APRIL 18, 2012
```

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

    GARY B. ANDREWS, JR., ESQ.
    THOMAS A. DOWNIE, ESQ.
    JASON R. BRISTOL, ESQ.

ON BEHALF OF THE DEFENDANT:

    BRETT C. BARTLETT, ESQ.
    LOUISA J. JOHNSON, ESQ.

ELISE SMITH EVANS, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
ATLANTA, GEORGIA

1             (Wednesday, April 18, 2012; Atlanta, Georgia.)

2             THE COURT:  Good afternoon.  Have a seat.

3             We're here today on the -- for a hearing on the Motion

4    for Conditional Class Certification or Collective Action

5    Certification in the matter of Kurtis Jewell versus Aaron's,

6    Inc., civil action number 1:12-cv-0563.

7             Counsel, would you introduce yourselves for the record?

8             MR. ANDREWS:  Good afternoon, Your Honor.  My name is

9    Blake Andrews, and I along with my co-counsel represent the

10   plaintiffs in this action.  With me today is Mr. Jason Bristol

11   and Mr. Tom Downie.

12            THE COURT:  Good to meet you.

13            MR. BARTLETT:  Your Honor, I'm Brett Bartlett.  I'm

14   here on behalf of Aaron's, Inc., along with Louisa Johnson, my

15   colleague, and the company representative Jessica Lawrence.

16            THE COURT:  Good to meet you, too.

17            All right.  I have reviewed your submissions and had

18   some questions, but also I'm happy if you want to make any

19   remarks before I ask any questions.  That's fine as well.  How

20   did you want to proceed?

21            MR. DOWNIE:  Your Honor, we -- obviously we would be

22   happy to do whatever you would like.  I have some points to make

23   that I brought, and I expected to answer your questions probably

24   instead.

25            THE COURT:  All right.

ELISE SMITH EVANS, RMR, CRR

1          MR. DOWNIE:  So, if you know --

2          THE COURT:   No, we can go ahead.  Let's try not --

3    let's not rehash things that are in the briefs, but, you know,

4    certainly feel free to make 5 to 10 minutes of remarks and then I

5    will chime in and ask some questions as well.

6          MR. DOWNIE:  Thank you, Your Honor.  May it please the

7    Court, I'm Tom Downie and we are here on behalf of the plaintiff.

8    It's -- as plaintiffs' counsel, it's tempting to begin and end

9    with the lenient standard that applies in these cases, much like

10   a criminal defense lawyer who relies on a reasonable doubt.  We

11   think that this case should be granted conditional certification,

12   not because the standard is lenient, but because of the strong

13   showing we have made.

14          I wanted to essentially do two things in these remarks,

15   in addition to answer the Court's questions.  One is to talk a

16   little bit about the context in which this issue arises, the

17   practical context, and then to talk about our showing.

18          THE COURT:  I think that would be helpful, because I

19   understand what the law is here.  So, I think it would be most

20   helpful just to discuss the facts.

21          MR. DOWNIE:  Thank you, Your Honor.  The -- without any

22   discovery in this case, the plaintiffs have come forward with the

23   plaintiff's declaration and declarations of declarants from 23

24   cities and 11 states.  There are additional -- as the Court is

25   aware, additional declarations have been coming in and we've been

1  filing those, along with consents to join the action as they come

2  in.

3          The -- we have, in addition to covering 11 states with

4  our declarations, we have geographic scope coverage from Georgia

5  to Arizona, northeast and west from Florida and Louisiana to

6  Ohio, Illinois, and Indiana.  We've covered all the regions of

7  the United States, basically.  We have the Southeast, the

8  Southwest, the Midwest, the East.

9          And in addition, our declarants are people who have

10 worked in all of the positions that would be included in the

11 class certification.  And we've briefed, I think, extensively the

12 issue of the propriety of covering multiple positions who are

13 covered by the same policy in this case.

14         It -- it is, we think, equally probative to look at the

15 absence of evidence from the defendants.  We had no discovery and

16 very little means to reach -- to identify potential class members

17 and reach out to them.  As we said in our briefs, we were able to

18 identify through our own devices about 200 primarily former

19 employees, most of them, and contact them with the request of

20 would they provide information that would help us for the purpose

21 of this motion.  But that is the extent of it.  We don't have any

22 ability obviously to obtain a name -- names of class members from

23 the defendant at this point.

24         The defendant, on the other hand, has 1,100 stores.

25 They have submitted 18 declarations.  And we think it is

1  worthwhile to pose the question of why there are only 18.  Were

2  there only 18 people interviewed?  What about the people who were

3  interviewed and for whom the defendants did not submit a

4  declaration?  The -- it would -- it seems unlikely to us to --

5  and unreasonable to infer that the defendant -- the defendant's

6  counsel interviewed many employees and simply chose to submit

7  only 18 declarations.  We think the inference is much more likely

8  that there were many more employees interviewed whose

9  declarations could not be submitted, either because they

10 themselves worked during meal periods that they were called upon

11 to work or that they had knowledge of this happening in their

12 stores.

13          The -- really, the last point on my list in terms of

14 the facts, Your Honor, was to speak to the credibility of our

15 declarants.  Their credibility has been attacked, and we think

16 unreasonably so.  They have all said in their declarations, and I

17 can assure the Court they have all told us quite elaborately, how

18 they have meal periods that are frequently interrupted by

19 management or by other co-workers with management's knowledge.

20 The defendant's own declarations show the context in which is

21 corroborative of this.  As we pointed out in our briefs, many of

22 these meal periods by employees are taken in the store's break

23 room, so the employees are available to be called back to work.

24          There's a passage in the defendant's brief that we

25 think is revealing.  That is on page 9 of the brief and -- this

1  entire section of their brief is heavily cited to the

2  declarations that the defendant submitted.  The brief makes the

3  point that the general managers or the GMs in the stores have

4  some latitude and some variation of how they schedule employees'

5  meal periods.  Some routinely schedule employees for an hour meal

6  period.  Others routinely schedule a half hour.

7          But then you have this point that is -- and I quote

8  from their brief:  Some managers who generally schedule hour-long

9  breaks permit their associates, their employees, to take half

10  hour meal period breaks on days when the store is understaffed.

11          We think that shows the kind of situation that our

12  declarants are talking about when they say that their meal

13  periods are interrupted for them to go back to work.  How does it

14  happen that a manager who has an employee who is out for an hour

15  break that was previously scheduled shortens that break to a half

16  hour?

17          We believe it happens in -- we believe inferentially it

18  happens in this way.  These companies like this are -- the store

19  labor costs, employee costs, is their primary variable cost, and

20  they are ruthlessly ruthless in their efforts to control them and

21  minimize them.  So, the general manager of a store is

22  intentionally staffing very leanly.  And when you have situations

23  that is described in their brief here and in their declarations

24  where a manager has a lean staff, has just had one of those staff

25  members out in the break room taking what was scheduled to be an

1  hour-long break, but suddenly there are a bunch of customers in

2  the store, that general manager goes to the break room and

3  shortens that employee's meal period from an hour to a half hour.

4  That's what their brief says.

5          Now, the question becomes:  What about the general

6  managers who routinely schedule their employees for a half hour

7  break?  Same thing is going to happen.  According to our

8  declarant's -- the declarations, what's happening is that their

9  meal periods are being interrupted and they're being called back

10 to work with less than a half hour uninterrupted meal period.  In

11 theory, they're supposed to have a half hour at least, but that's

12 not what's happening with this company.  We believe our

13 declarations show that that is happening on a widespread basis.

14 And there is every reason to believe that it is happening even in

15 the areas that we don't happen to have declarations for because

16 we were unable to locate people to reach out to.

17         THE COURT:  I didn't count, but your brief says here --

18 that you've submitted -- collectively these employees held 38

19 position and you go through how -- are we -- do you have 30 -- I

20 simply didn't count.  Do you have 38 submissions or did the

21 declarants in total hold 38 positions?

22         MR. DOWNIE:  They have held 38 positions.

23         THE COURT:  All right.

24         MR. DOWNIE:  They -- each of them on their declarations

25 circled the positions they held and many circled two or three.

```
 1              THE COURT:  Right.  So, what was the total number of
 2    declarants?
 3              MR. DOWNIE:  13 -- I am -- forgive me.
 4              THE COURT:  We'll count.  That's all right.
 5              MR. DOWNIE:  We think we're at 23 now, Your Honor.
 6              THE COURT:  All right.
 7              MR. DOWNIE:  Forgive me.  I drew a blank on that
 8    number.
 9              THE COURT:  That's fine.  Your complaint at paragraph
10    23 references a prior settlement in 2004.  What do you contend
11    the relevance is of that allegation?
12              MR. DOWNIE:  Settlement with Aaron's Rents?  Your
13    Honor, I'm not sure that it has any relevance at all.
14              THE COURT:  All right.
15              MR. DOWNIE:  It's background, and I can't even speak to
16    why it is in our complaint.
17              The --
18              THE COURT:  I'm not saying it doesn't.  I'm just asking
19    you what you're contending is the relevance.  Is this included
20    for purposes of proof of willful violation, is it proof of
21    something else?  I'm just trying to understand what you -- when
22    I'm looking at the totality of the pleadings and submissions --
23              MR. DOWNIE:  Your Honor, I can't speak to why it was
24    put in the complaint --
25              THE COURT:  All right.
```

ELISE SMITH EVANS, RMR, CRR

```
1          MR. DOWNIE:  -- because I didn't do that.  But it may
2   well have relevance in terms of background for things like the
3   Court suggested.  The -- it is some indication that this meal
4   period problem is an ongoing problem, that they have been sued
5   for it before.  But I -- we are not contending that they have
6   been found guilty of it in a prior case.
7          THE COURT:  All right.  In paragraph 22 -- and
8   obviously the thrust of your motion is that plaintiff is
9   similarly situated to account managers, manager trainees, sales
10  managers, customer service representatives and/or product
11  technicians.  Now, I believe that the Plaintiff Jewell had worked
12  as an account manager, manager trainee, and sales manager.  He
13  had not worked -- and, so -- and it seemed like a number of
14  people, even among the people -- among the affiants even that --
15  that the defendants had submitted, had comparably held those
16  three positions.
17          I'm trying to understand, is that a different kind of
18  career chain or not from the position of customer service rep and
19  product technician?  And are there other jobs as well?  I'm
20  trying to understand what this amalgamation of jobs represents.
21          MR. DOWNIE:  I understand.  First of all, it's my
22  belief that our class definition includes all of the hourly
23  employees in the Aaron's stores.  And that's based upon our
24  investigation to date, that's what we have found, that -- I can't
25  say there isn't a different position in some store in Iowa of
```

1   Aaron's.  I don't -- I don't have that information or access to

2   it at this point.

3          As far as the changes between these jobs, I -- from --

4   from what we've seen in the declarations, not every -- I haven't

5   seen declarants who have progressed from one to the other to the

6   other and worked through all of them, but they all have held --

7   it is represented among the declarants individuals who have held

8   all of those positions in the stores, and in most cases also

9   several others.  So, I think that the answer is -- and this is

10  the best answer I can give, again, pre-discovery without having

11  been able to question the company about this.  But the answer

12  that is coming out of our investigation is that employees --

13  there isn't a discrete job path that leads to a sales

14  representative versus a customer representative or that sort of

15  thing that these jobs --

16          THE COURT:  Well, to your knowledge, are these the only

17  hourly employees or are there other job titles?

18          MR. DOWNIE:  I believe these are the only hourly

19  employees in the store.

20          THE COURT:  All right.  All right.

21          MR. DOWNIE:  And that was our intent.  And --

22          THE COURT:  Do you have any -- I'm going to -- I'm

23  going to ask Mr. Bartlett the same question or Ms. Johnson,

24  whoever will be speaking.  But based on your investigation, do

25  you have any viewpoint as to whether these jobs are -- the

1  demarcations of these jobs are kind of movable and they depend on
2  which store how they're defined, or are they -- as in certain
3  civil service jobs, for instance, if you are a -- you know, if
4  you're a clerk, you're a clerk and if you're a bottle washer,
5  you're not and the two shall not meet.
6          MR. DOWNIE:  The evidence suggests -- the evidence
7  being that we have declarants from various parts of the country
8  who have held all of these different positions, so the positions
9  seem to exist just as much in Arizona as in Georgia and et
10  cetera, et cetera.
11         THE COURT:  Yeah.
12         MR. DOWNIE:  And to -- to answer that and also to go
13 back to the previous question for a minute, in terms of the scope
14 of the class and what positions we have in it and what positions
15 may have been left out, it was our intention -- it was our belief
16 that this wage and hour practice affects all of the hourly
17 employees in all of the Aaron's stores.  So, our class definition
18 really is intended to cover all of the hourly employees.  We
19 believe that the list of positions is synonymous with that, that
20 that is all of the hourly employees in all of the stores.
21         THE COURT:  I don't think you've really answered my
22 question, though.  My question was based on your interviews --
23 and I don't mean to have you reveal any confidential information,
24 but I'm just asking if I am a technician, for instance a product
25 technician in store number 101 in Atlanta, does that mean if I go

1   to store 202 in Charleston, South Carolina, I will perform the

2   same job duties as a product technician or might I in fact be

3   performing the duties -- different duties that might be closer

4   to, let's say, that of a customer service rep?

5         MR. DOWNIE:  Your Honor, I appreciate I didn't address

6   myself to that well enough before.  In fairness, at this stage of

7   our understanding as plaintiffs, we've talked with a couple of

8   handfuls of people, and that particular question wasn't the

9   particular question we were asking when we were asking them about

10   their experience as hourly employees with the meal period.  But

11   also, Your Honor, I think that it is fair -- it certainly seems

12   to us that an -- as someone who works as a sales representative

13   in Georgia could move to Arizona and hold the sales

14   representative job and do essentially the same job.  It also

15   seems to be the case that someone who's a sales representative in

16   any of these stores could also move to any of the other

17   positions, that those are not separate career paths, if you will.

18         THE COURT:  Well, it sounds like you don't know is

19   actually -- that's fine.  I'm just trying to understand what you

20   do know.  I think that you -- or at least one of your pleadings

21   indicated that you thought that there were approximately

22   potentially 4,000 members in this class.

23         MR. DOWNIE:  I think that's right.

24         THE COURT:  And on what do you base that projection?

25         MR. DOWNIE:  There are -- there are 1,100 company-owned

1  stores.  There are we know these five positions at least possible

2  to be employed in the store, and we're covering a three year

3  period, so we're not simply talking about the current employee

4  workforce.  The class is probably at least 4,000.  That's what we

5  would base that on.

6        THE COURT:  And do you have any breakdown, for instance

7  if I were to limit it in any regard, as to how -- how large it

8  would be depending on -- let's say we did it for account manager,

9  manager trainee and sales manager.  Would I just simply do the

10 1,100 times three or 1,100 times --

11        MR. DOWNIE:  I don't know.

12        THE COURT:  You don't know?

13        MR. DOWNIE:  I couldn't answer that, Your Honor.

14        THE COURT:  All right.

15        MR. DOWNIE:  I do know this, that there is no evidence

16 that the deprivation of free meal periods is occurring in one of

17 those groups and not in another.  They seem by all of the

18 evidence to all be subject to this practice and affected by it in

19 the same way.

20        These positions are not so vastly different.  I mean,

21 they wear different hats in the stores, but they're all

22 essentially dealing with customers who come in to rent things for

23 the purpose of eventually possibly owning them, and moving from

24 one of those positions to another is not a big move.

25        THE COURT:  I'm looking for what your -- I have read

1    your memorandum.  I'm trying to find your motion defining the

2    collective --

3              MR. DOWNIE:  I have it.  Yeah.

4              THE COURT:  Number 18, I guess, in the --

5              MR. DOWNIE:  If you --

6              THE COURT:  Well, I think -- is it the one -- document

7    18 filed on December 30th, 2011?

8              MR. DOWNIE:  Yes, Your Honor.

9              (A pause in the proceeding was had.)

10             THE COURT:  Okay.  Thank you very much.

11             MR. DOWNIE:  Your Honor, Mr. Bristol tells me he has

12   knowledge on one of the points you asked.

13             THE COURT:  All right.  Let me hear from him, then.

14             MR. BRISTOL:  Your Honor, just -- I don't again have

15   tons and tons of specific knowledge, but the reason I have some

16   knowledge is I did a lot of the interviews that Your Honor

17   ordered us to conduct after we had the telephone conference --

18             THE COURT:  Yes.

19             MR. BRISTOL:  -- regarding the quality of our

20   declarations.  The product technician works essentially as a

21   route driver.  So, to specifically answer Your Honor's question,

22   somebody delivering products or driving a route would be somewhat

23   different from someone who works in the store.  But as to the

24   unavailability of meal periods, 100 percent across the board all

25   interviewed experienced the same disruption to their ability to

```
1   have a meal period.

2          And with respect to the positions in the store, our

3   very basic understanding is that they are movable, that folks are

4   moving around these positions in hopes of getting to a higher

5   position, maybe a general manager position some day, but they are

6   basically interchangeable.  And you'll see on the declarations

7   that they work at various stores in those various positions.  So,

8   you can go from store number 5 to store number 10 and you will

9   perform the same job duties.

10         THE COURT:  Well, let me ask you this question as the

11  individual who conducted the interviews.  You've -- I'm confident

12  you've read the affidavits the defendant has submitted.  What do

13  you make of the fact that there is such -- that the affiants

14  positively -- basically provide a very different story to what

15  your folks are telling you?

16         MR. BRISTOL:  I can't, you know -- again, as Mr. Downie

17  mentioned, without actually getting into the minds or

18  interviewing or testing the veracity of those statements, I can't

19  give you a very definite answer.  It is typical in these cases

20  that there's a battle of declarations that ensues when the

21  plaintiffs put forward a very straightforward declaration based

22  on what the experience might be during the meal period.  You very

23  commonly get a very detailed declaration that says something

24  quite different.

25         I can tell you, standing here in your courtroom, that
```

1    the basic substantive allegation, that the meal periods are being

2    interrupted on a significant basis -- and we're talking about

3    very significant basis -- that ran through each of the jobs in

4    the declaration and in the category of product technician very

5    equally.  The numbers were very similar, but it is a slightly

6    different job and peer product type.

7              THE COURT:  All right.  Let me ask you, you or any of

8    your co-counsel, this last question.  One of the major concerns

9    that the defendant has posed is one concerning manageability of

10   such a large class.  And obviously in their submission, they

11   believe that this will take I believe a year to prepare, if I

12   could recall correctly.  Maybe you agreed that it will take a

13   year as well.  I can't remember.  But address for me, if you

14   would, those manageability concerns, as well as what type of

15   discovery period you think will be required.  And, again, you can

16   decide among yourselves who's best to respond to that.

17             MR. BRISTOL:  I'm happy to speak to that briefly.  With

18   respect to manageability, getting the notice out so that the

19   statute of limitations concern is addressed and folks have an

20   ability to decide whether or not they want to participate in the

21   case, that will be relatively easy.  We can either do it in-house

22   ourselves, which is a matter of just putting a envelope, whether

23   it's 2,000 or 6,000 in the mail.  We've agreed on the notice

24   period those will come back in.

25             The participation rates in these case, Your Honor --

1    these cases are typically 10 percent to maybe 30 percent on the
2    high side.  It's very likely, since folks have to come forward
3    and say, I, Mrs. Smith, want to take on my employer Aaron's, that
4    we'll be in that category.  So, we're not going to probably have
5    thousands and thousands and thousands of people, you know, when
6    we look at it in the totality.  It will probably be 10 to 20
7    percent of that.
8            With respect to discovery, we will be fighting about, I
9    think, and asking for Your Honor's guidance on what the
10   appropriate scope of discovery is.  A representative or smaller
11   sample of these folks from a representative group or the regions
12   is a way that typically results in a nice sampling or a nice
13   cross-section of what the experiences were nationwide.  That can
14   be done.  We've done it together in other cases.  We did it -- a
15   number of depositions in another case that took us probably six
16   months.  But this is not something that's going to require us to
17   have a protracted litigation schedule.  It will require us, with
18   your assistance, to be smart about how big the scope is so that
19   we're getting quality discovery versus quantity.  If we do that,
20   this will not be any more -- it shouldn't be more unmanageable
21   than any more complex case on your docket.  We can do it.
22           THE COURT:  Thank you.
23           MR. BARTLETT:  May I speak, Your Honor?
24           THE COURT:  Yes.
25           MR. BARTLETT:  My name is Brett Bartlett and I'm here

1   on behalf of Aaron's, Inc.  May it please the Court.

2            I think that I need to respond to a few things that the

3   plaintiffs' counsel said, and then -- although I understand Your

4   Honor is aware of the law in this area, there are a couple of

5   points made in the plaintiffs' reply brief that I'd like to

6   respond to.

7            THE COURT:  Certainly.

8            MR. BARTLETT:  For one thing I'll point out that almost

9   everything that plaintiffs' counsel has said about the duties

10  performed in the stores is obviously testimony of the attorneys

11  and not of any affiant in the case.  And there are a number of

12  cases out there that have pointed out that the testimony of

13  counsel is insufficient to justify conditional certification of a

14  class.

15           An interesting question to me would be if these

16  attorneys were told all of that stuff by their clients and

17  potential clients, why didn't it land in the declarations that

18  were submitted?  Not to suggest that they're being untruthful

19  about what they're saying, but they had an opportunity to present

20  declarations that contained all of that information.

21           And one of the things that I'd like to discuss in just

22  a moment are the two cases up in the Western District of

23  Pennsylvania that plaintiffs cite in their reply brief that

24  conditionally certified classes in the health care industry based

25  on meal break allegations.  That's the *Camesi vs. University of*

1   *Pittsburgh Medical Center* case and the -- I have a hard time with

2   the name -- *Kuznyetsov vs. West Penn Allegheny System, Inc.* case.

3   And I brought copies of the decisions that I'd like to discuss,

4   both of them issued on December 11 -- or 20, 2011.

5           THE COURT:  Great.

6           MR. BARTLETT:  Your Honor may have seen them.  Would

7   you like me to present?

8           THE COURT:  Go ahead and if you have an extra copy,

9   that's fine.

10          MR. BARTLETT:  Along with the cases with the orders and

11  the opinions that I'll provide, I'll also momentarily present you

12  with some of the -- the Court with some of the declarations that

13  were submitted in the case.  May I approach, Your Honor?

14          So, Your Honor, in both of those cases, the magistrate

15  judge in Camesi and the senior district court judge who presided

16  over Kuznyetsov, I'll call it the West Penn case instead --

17          THE COURT:  Okay.

18          MR. BARTLETT:  -- granted conditional certification

19  back in 2009 of classes that were -- that contained a number of

20  positions within a hospital system or within the two separate

21  hospital systems in the two different cases.  They were

22  prosecuted by the same plaintiff's attorney or plaintiff's firm.

23          While we disagree with the original conditional

24  certification order -- and plaintiffs cite to the conditional

25  certification order in both cases in their reply -- both judges

1  on December 20th issued orders decertifying the conditionally

2  certified classes.  And if I may read for you a section from the

3  Camesi case -- let me see if I have the page number.  I

4  apologize.  I actually don't have the page number, but here -- in

5  Camesi the court acknowledged in December of last year that it

6  conditionally certified the meal break case "without the benefit

7  of the recent jurisprudential developments in the realm of FLSA

8  meal break litigation."  The court went on to explain, again a

9  quote, "Since the undersigned's grant of conditional

10 certification, a growing consensus of federal courts has rejected

11 the notion that collective action treatment of automatic

12 deductions is warranted."

13         The court then went on to cite and quote from a case

14 called *White vs. Baptist Memorial Health Care Corp.*, and that

15 case arose in the Western District of Tennessee after the case --

16 the Lindberg case to which the plaintiffs cite in their brief.

17 And in that case, as the court in Pennsylvania pointed out, the

18 court held, "To bind together otherwise differently situated

19 employees, an alleged common policy must potentially violate the

20 FLSA.  Standing alone, an employer policy providing automatic

21 deductions for meal breaks does not violate the FLSA.  Therefore,

22 [an employer's] mere adoption of a system that, by default,

23 deducts meal breaks from its employees' compensation does not

24 constitute a unified policy of FLSA violation capable of binding

25 together [a collective action]."

1          So, in that case the judge -- although she does say,

2    I'll point out, that given the same arguments and evidence that

3    she had in 2009 before her, she would have probably granted

4    conditional certification again.  She recognizes, and I think

5    implicitly suggests, that with the argument that would be based

6    on the current jurisprudential authority having to do with meal

7    breaks, she would have denied conditional certification.

8          The other case, the -- what did I say, call it -- the

9    West Penn Allegheny case, that was the Senior District Judge

10   Donetta Ambrose who decertified that case.  And this goes to some

11   of the issues that -- that the defendant presents in its brief

12   regarding the individualized analyses that make these cases

13   inappropriate.  The court explained, speaking of those

14   individualized analyses, "For example, it will be necessary to

15   consider whether each plaintiff had knowledge of the cancellation

16   policy" -- speaking of the meal break cancellation policy at

17   issue in that case -- "and how to cancel an automatic deduction,

18   whether they worked through a meal break, whether defendants had

19   knowledge that plaintiff worked through the meal break, whether

20   the meal break deduction was cancelled, how it was cancelled,

21   whether that plaintiff was compensated for that time, if not,

22   whether defendant had knowledge that plaintiff was not properly

23   compensated."  And the knowledge -- the court went on to say,

24   "The knowledge and testimony of each individual manager over the

25   putative class members will be highly relevant and necessary for

1    defendants' defense to the allegation."  And there they said,

2    "Again, there are 312 different supervisors."

3           One of the points that I would take issue with what

4    plaintiffs' counsel has said a moment ago is that there actually

5    are in the past three years across 1,100 stores on average of 7

6    hourly employees working in each store.  So, the current

7    population alone right now is 7,000.  Looking back across three

8    years with attrition, it would be a much more sizeable class.

9           And each one of those stores has a manager, so unlike

10   in this case that was concerned about 312 different supervisors

11   in one location, we have thousands to deal with and from whom

12   relevant information would have to be collected.

13          And, frankly, this is not dissimilar from what the

14   plaintiffs argued in opposition to the defendant's Motion to

15   Transfer this case down to Georgia.  They said -- and this is at

16   docket 27, page 9, and that's their opposition to our Motion to

17   Transfer, defendants -- and these are -- this is a quote:

18   Defendant's headquarters personnel cannot answer disputed -- the

19   disputed issue:  whether employees of hundreds -- or in hundreds

20   of Aaron's stores across the country worked during their meal

21   periods without pay.  The company representatives with knowledge

22   about this disputed issue are the general managers at the store

23   who are responsible for enforcing the company's timekeeping

24   policies.  Consequently, to obtain firsthand knowledge of how the

25   timekeeping policies are implemented and enforced with the

```
 1  store-level associates, it would be necessary to speak to the
 2  general manager or others at the store level.
 3           So, this goes to support probably what the growing
 4  trend of cases in -- or growing trend of courts dealing with
 5  these cases has found.  Meal break policies like the one at issue
 6  in this case simply do not warrant conditional certification, and
 7  that's probably why no court has ever conditionally certified a
 8  collective action that spans across an employer's national
 9  operations and sweeps in, as plaintiffs point out, all hourly
10  employees on the basis of a meal policy -- meal break policy
11  alone.  Indeed, almost --
12           THE COURT:  Well, do you have any cases that have
13  rejected that?
14           MR. BARTLETT:  That have rejected --
15           THE COURT:  Expressly rejected that request?
16           MR. BARTLETT:  Yes.  And the only case in this circuit
17  that has -- well, the only case in Georgia where we've seen it
18  arise and the order or the opinion has been published is the
19  Ledbetter case down in the Middle District of Georgia that
20  refused to conditionally certify, and then --
21           THE COURT:  In Ledbetter weren't they further along in
22  discovery?  That's -- I mean, it really provides a more intensive
23  review of the -- of the facts.  It's almost -- sort of like a
24  quasi stage two review.
25           MR. BARTLETT:  Sure, I believe.  I acknowledge that,
```

```
 1   Your Honor.  But we do have -- so, other cases include Carruthers
 2   vs. Keiser School, Inc., from the Middle District of Florida, and
 3   then the Handy Dandy list of cases denying the request can be
 4   found in the Camesi decision that I just handed to you.
 5              THE COURT:  All right.  At what page?
 6              MR. BARTLETT:  It looks like it's at the top of *16.
 7              THE COURT:  Okay.
 8              MR. BARTLETT:  And, now, several of these were
 9   decertification cases, but several -- the first one, Blaney vs.
10   Charlotte-Mecklenburg Hospital Authority, that was a conditional
11   certification case.  And the Cason vs. Vibra Healthcare matter
12   was a conditional certification denial.  The others in that list
13   were decertification cases.
14              And I'll just go on to point out that in those cases
15   that have conditionally certified classes based on meal break
16   allegations, almost all of them looked at a -- a limited number
17   of positions at a single location or a couple of locations or
18   confined within a city, and almost none of them ever went beyond
19   the city.  In fact, I'm not aware of any that went beyond the
20   city.  The biggest one that was conditionally certified was in
21   Camesi, and that involved a bunch of different positions and it
22   involved a number of different locations, and that's the one
23   where the magistrate judge came back and said probably wouldn't
24   have done it.
25              I will point out in full candor that the -- there are a
```

1    string of cases that have granted conditional certification up in

2    New York, the Northern District of New York and the Western

3    District of New York, and plaintiffs' counsel or plaintiff has

4    referenced those in their brief.  Each of those really was

5    confined to either one or two positions or to one or two

6    locations.  And, in fact, the Hintergerger -- so many case names

7    that I can't pronounce today, but the -- let me see if I can

8    track it down.  The one from the -- I think it's from the Western

9    District of New York, requested a large class and then pointed

10   out plaintiffs only occupied, I think, two of the positions at

11   issue and said we'll grant a -- we'll conditionally certify a

12   class comprised of those two positions in a single location, but

13   no farther.

14           THE COURT:  Well, let me ask you this.  Would another

15   response on my behalf properly be to certify a case involving the

16   stores of the 23 affiants that filed thus far?

17           MR. BARTLETT:  Your Honor, I would -- I would take

18   issue with an order, but it would be certainly more appropriate

19   than a national class.

20           And if I may -- let me make sure I've got the right

21   stuff here.  I didn't label these quite appropriately, but these

22   are the declarations or copies of declarations -- not all of

23   them, just one -- of declarations submitted in the Camesi and

24   the -- the other Pennsylvania case.  What Your Honor will see in

25   looking at those declarations that justified probably the larger

1    of the meal break conditional certification orders in existence,

2    those declarations were 48 paragraphs long and many pages, 8 or 9

3    pages, and really delved into the types of duties performed by --

4    well, not as much as some of the other stuff, but they delved

5    into the duties performed by the employees at issue and explained

6    why it is that the positions held by the employees and, in

7    addition, why the employers' approach to the meal break policies

8    caused them to work off the clock.  For the most part, these were

9    people -- employees who were working in patient care positions in

10   hospitals and were required by their supervisors or managers to

11   stay with patients or to avoid their meal breaks altogether

12   because of the severe need for staffing in the hospitals.  Your

13   Honor, respectfully, the declarations submitted in support of

14   plaintiffs' motion bear no resemblance to those.

15          The other case that plaintiffs cited to in their reply

16   brief, the one from the Western District of Tennessee -- give me

17   one second just to make sure the record's clear.

18          (A pause in the proceeding was had.)

19          MR. BARTLETT:  The Lindbergh case from the Western

20   District of Tennessee, a review of the record in that case -- and

21   I brought this with me, but I don't know that I need to provide

22   you with this.  But the declarations were much shorter than the

23   ones that I just submitted from the Pennsylvania cases.  But in

24   addition to those, the court had before it interrogatory

25   responses and other discovery taken from the various individuals.

1    So, that case was conditionally certified.

2            I'll point out that it quickly settled for pennies on

3    the dollar.  The settlement agreement is part of the public

4    record.  And I took a look at it and it just ended up, probably

5    because of the trend that we're seeing in these cases, going

6    away.  I'd be happy to talk more about these various points, but

7    I'll also, let's see, go back to just a few points that the

8    plaintiffs raised.

9            THE COURT:  Okay.

10           MR. BARTLETT:  So I've already talked about the scope

11   of the class being much larger than what the plaintiffs

12   suggested.  And I think Your Honor picked up on this, but there

13   are not 38 positions across the company.  There are only five

14   positions across the stores that are hourly, but not every store

15   has the same positions in them.  They have different staffing

16   models depending upon need.  An employee -- and this is all

17   suggested within the evidence that -- or the declarations that we

18   presented.  But there can be some overlap of duties within the

19   various positions.  There's not a lot of it.

20           But, for instance, the product technicians to whom

21   counsel referred earlier are, generally speaking, out in the

22   field servicing customers, making deliveries and that kind of

23   thing.  Occasionally another of the positions will jump into that

24   role and also -- or will go out to public areas, for instance,

25   and try to bring in business.  And there may be overlap in those

1    types of duties.

2          I think that that's relevant because the duties

3    performed by these employees and where they perform them and when

4    they perform them all go into the answer in the questions of when

5    do they take their meal breaks, where do they take their meal

6    breaks, how do they take their meal breaks.  So, are they taking

7    an hour-long meal break -- which is entirely permissible -- 30

8    minutes -- which is also permissible -- something in between?

9    Where are they doing it?  Are they doing it at the Wendy's or the

10   Kroger down the street?  And how are they doing it?  Are they,

11   you know -- I hope this is not always the case, but are they

12   eating as product technicians in their cars, anything like that?

13   So, all of those things go to it.

14          In terms of a career progression, sometimes there's a

15   career progression, sometimes there's not.  But each of these has

16   its own separate job description and sometimes people will bounce

17   around.

18          You know, I will point out that I'm not sure the number

19   of declarations or the place where plaintiffs are getting the

20   number of declarations.  I'm aware of 18 that were filed in

21   support of the Conditional Certification Motion.  If there are

22   more that have been filed since then, I'm not certain they would

23   be appropriately included in the Court's consideration in this

24   motion.

25          And then, finally, I'll just -- unless Your Honor has

1    questions for me, I'll point out that the cases in the Northern

2    District of Georgia that have granted conditional certification,

3    one as recently as April 6th from Judge Jones, have involved

4    truly a very limited class.  For instance, one of them -- well,

5    the April 6 order I actually wrote down the class definition

6    because I found it interesting.  The class defined was sales

7    employees who worked in defendant's northern and Atlanta regions

8    as senior sales supervisors and sales representatives and worked

9    under Mr. Shumacher who was a manager.

10           Then, the *Clincy vs. Galardi* case involved exotic

11   dancers at a local strip club.  And they actually alleged that

12   they were misclassified as independent contractors, which was a

13   clear expression of an unlawful policy.

14           *Riddle vs. SunTrust Bank* similarly involved a single

15   position and then an allegation of misclassification.

16           So, I'd say finally, one more thing.  I'm sorry, Your

17   Honor.

18           THE COURT:  That's all right.

19           MR. BARTLETT:  Looking at the -- looking at some of the

20   jurisprudence in this area, there is a lot --

21           THE COURT:  What I just wanted to mention in that

22   regard is didn't the most recent Eleventh Circuit case or large

23   one, *Morgan vs. Family Dollar*, that involved a nationwide

24   retailer --

25           MR. BARTLETT:  A single -- yes, of a single position.

1          THE COURT:  All right.

2          MR. BARTLETT:  And, so, while -- you know, I can get

3     into the *Morgan vs. Family Dollar* case and discuss it, but in my

4     view and having recently mediated a case before a magistrate

5     judge who was intimately involved in that case, that -- the

6     Eleventh Circuit's decision essentially said, looking at a jury

7     verdict and looking very briefly at the decertification order in

8     that case, we cannot find that the judge abused discretion -- or

9     abused his discretion.

10         THE COURT:  Right.

11         MR. BARTLETT:  And, so, I'm not sure that that has a

12    whole lot of probative value, although it certainly is a -- a

13    lightening rod in these cases in the Eleventh Circuit.  But I

14    think that it's very distinguishable from this case.

15         So, going back to the -- to a point that I was going to

16    make, the -- having looked at a lot of the jurisprudence in this

17    area, there's a lot of talk in some of the cases about the need

18    of a plaintiff to establish that there's actual -- or to put

19    forward evidence that there's actually a violation of the FLSA,

20    either in the declarations or in the complaint or both.  I think

21    that the weight is towards having evidence.  Plaintiffs'

22    declarations don't make any reference to an FLSA violation.  What

23    they say is I had 30 minutes deducted from my pay each day, which

24    is not a violation.  And some of the cases that plaintiffs have

25    cited actually point that out.

```
 1              In addition, the complaint -- I think one of the
 2   paragraphs might be stretched to connect the dots, but it's a
 3   stretch.  And, so, if I were to look at a combination of the
 4   complaint and the declarations, there's very -- very little to
 5   suggest that there's actually a violation of the FLSA going on
 6   here.  So, taking that type of evidence and recognizing that
 7   there's no decision out there that said -- says this is the
 8   amount of evidence that you must have, I think that the
 9   suggestion is that there has to be at least some that rises to
10   the -- to a modest showing.  Otherwise, there would be no reason
11   to fight over conditional certification in the first place.
12              THE COURT:  Well, let me hear from you as to if I were
13   to certify this case, what would you consider a appropriate
14   definition of the -- of the collective action, the scope of it?
15              MR. BARTLETT:  According to the -- let me make sure
16   I've got the name of the case right.  My notebook fell down in
17   the rain outside, so --
18              THE COURT:  Too unused to having rain, apparently.
19              (A pause in the proceeding was had.)
20              MR. BARTLETT:  So, the -- I apologize.  The
21   Hinterberger case from -- I was right -- the Western District of
22   New York is the one that suggested that the only appropriate
23   class, at least in that case, would be one that was comprised of
24   employees who worked at the location where the plaintiffs -- the
25   named plaintiffs worked and the position that the named plaintiff
```

1    filled.  So, in this case the only conceivable class that I could

2    see appropriate under the authority the plaintiffs cited to, we

3    didn't bring it in, is a class comprised of employees at the

4    store where the plaintiff worked in the positions that he filled.

5    In over three years, I mean, that could be -- that would still,

6    you know, potentially be a sizeable class.  And, of course --

7              THE COURT:  Well, I feel like the -- both parties are

8    sort of not being very helpful in this regard, because I feel

9    like on one hand if in fact there is some type of -- and that's

10   if, totally if, honoring of the policy that Aaron's maintains

11   only in the breach and that in fact it's completely on a routine

12   basis broken, then I have to look at a broader range of stores.

13             And on the other hand, I completely understand your

14   concerns about a nationwide action.  I'm not sure, though, that

15   limiting it to one store is necessarily more logical than

16   limiting it to, you know, let's say, all stores under that

17   region.  Maybe that region doesn't care that much.  I don't know

18   much about the structure of the company, obviously.  But, you

19   know, on one hand the plaintiffs' evidence might suggest, because

20   it does come from so many different regions, that this is a

21   practice and problem that is -- that is more pervasive than one

22   region, that it's, in fact -- you know, simply pops up all over

23   the country in a variety of contexts regardless of the job and,

24   therefore, that it reflects -- it does reflect a -- kind of a

25   routine practice within the company, even though it may be

```
 1  contrary to formal policy.

 2          MR. BARTLETT:  If I may.

 3          THE COURT:  Yes.

 4          MR. BARTLETT:  The -- I appreciate Your Honor's concern

 5  about that.  In our view, and with respect, the standard is not

 6  one that says let's take a few form declarations that don't

 7  engage the plaintiff -- the defendant's declarations to the

 8  contrary and then infer or surmise that there might be violations

 9  at other locations, which is kind of what plaintiffs' counsel was

10  suggesting, that based on what they heard from their clients and

11  based on some sort of reading, magical I would suggest, of the

12  declarations, there must be violations at other stores.

13          The fact of the matter is there's simply not any

14  evidence that suggests that that is the case or suggests that

15  there's a violation at any of these stores where someone, to use

16  plaintiffs' example, suddenly didn't have an hour-long break, but

17  instead had a 30 minute break.

18          There's -- there's no allegation in this case, not in

19  the complaint or in the -- in the declarations to suggest that

20  that labor control issue that we saw going back as far as the

21  Food Lion cases and Masarti, that that labor budgeting issue

22  arises here.

23          And it's not a case like the direct patient care

24  hospital cases where there was an allegation.  In one of those

25  cases the policy was you are responsible for your -- recording
```

1    your own breaks and really placed the onus on the employee.  And

2    the same evidence -- in that same case, the evidence was that the

3    supervisors were saying, no, you can't take a meal break and

4    don't record.  If you eat anything you get the break.

5           That's simply not the case here.  It's according to the

6    evidence, the only evidence that really speaks to the matter, the

7    supervisors, the store managers at these stores are going out and

8    trying to make sure that people are taking their breaks.

9           I recall one thing I was going to say.  The idea that

10   our client didn't spend thousands of dollars to go out to all the

11   various stores and collect hundreds of declarations --

12          THE COURT:  I'm not -- I'm not doing this on a counting

13   basis.  I mean, I think that that's -- I think the plaintiff has

14   provided a sufficient number of affidavits and you have as well.

15   You know, whether they -- what the content is is another

16   question, but I'm not doing this based on the numbers, because

17   you've given a good number and they have as well.

18          MR. BARTLETT:  Your Honor, I would point out just one

19   thing -- one other thing that came out in response to a question

20   that you asked.  The Oklahoma case, that case did settle.  It

21   settled after the court denied conditional class certification in

22   a meal break case.  So, I don't know what the settlement value

23   was and I'm not sure I would be able to disclose it today, but --

24          THE COURT:  Yeah.

25          MR. BARTLETT:  -- it went away very inexpensively.

```
 1              May I answer any other questions?

 2              THE COURT:  Well, we can get into this further, but

 3   just so that I -- later on, but I wanted to ask you a few

 4   questions about --

 5              MR. BARTLETT:  Your Honor --

 6              THE COURT:  -- your positions in the Preliminary Report

 7   and Discovery Plan.

 8              MR. BARTLETT:  Yeah.  And one thing that I'll point

 9   out, Your Honor, if there is -- if this Court is considering a

10   more limited class than the one that plaintiffs request, it's not

11   uncommon in these cases that the Court would require some

12   discovery that goes into -- to go into the next determination --

13   or a determination of whether that more limited class should

14   survive.  And *Morgan vs. Family Dollar* is actually one of the

15   cases where that happened, and there are others in this circuit

16   as well.

17              THE COURT:  Well, remind me in Morgan how that

18   transpired.  Was there an original broader certification and

19   then -- and then it was narrowed or was there discovery -- or did

20   the court defer?

21              MR. BARTLETT:  I think the -- and my recollection may

22   be a little bit off on this, but I was -- I was thinking that it

23   was a Motion for Conditional Certification and a push-back to

24   take more discovery.  I may be confusing it with another Eleventh

25   Circuit case.  But I think the Grayson case as well had
```

```
1   additional discovery taken.  That was an ADEA case, so it was

2   different.

3            THE COURT:  Right.

4            MR. BARTLETT:  But my point is that it's not uncommon.

5            THE COURT:  All right.  It's helpful.  Thank you.  I

6   know that you had wanted to see an independent administrator,

7   if -- if I were to certify the class action.  Did you -- did the

8   parties discuss, if that happened, who that would be and who

9   would bear the cost?

10           MR. BRISTOL:  No, Your Honor, we have not.

11           THE COURT:  Do you have a position as to that?

12           MR. BARTLETT:  We -- we do think that the TVA would be

13  the right way to go, but if plaintiffs' counsel are making the

14  admonitions that they've made, then we'd be willing to work with

15  them on that as well.  So, you know, it's -- there's not much of

16  a difference between the two, so we could discuss that and maybe

17  reach a resolution with plaintiffs' counsel.

18           THE COURT:  Okay.  All right.  Thank you very much.

19           MR. BARTLETT:  Thank you.

20           MR. DOWNIE:  Your Honor, could I make a couple of

21  points?

22           THE COURT:  Absolutely.

23           MR. DOWNIE:  Thank you.  My points are brief, Your

24  Honor.  But first of all, to require plaintiffs to prove beyond

25  what plaintiffs could reasonably be able to prove at this stage
```

1  would not be consistent with the intent of the remedial statute

2  and Section 216(b) saying that employees should be able to

3  proceed collectively as construed by the Supreme Court.

4          And we understand it's not every case that can proceed

5  prospectively, but to -- to exclude a case on a -- on evidentiary

6  basis that plaintiffs couldn't meet without -- at this stage, we

7  think -- we would suggest is not intent -- is not consistent with

8  the intent.  This case is not a big, complicated case.

9          The Camesi case, which is one of those Western District

10 of Pennsylvania cases, page 6 of the slip opinion that -- from

11 December 2011, says the opt-ins fell within over 500 different

12 job titles, working in over 1,000 different departments.  We have

13 five positions all working in one store.  We do not have a big

14 case.  We don't have a huge group.  And as far as what is really

15 at issue in this case, we're not complaining about the

16 auto-deduction policy.

17         THE COURT:  You're not complaining about what?

18         MR. DOWNIE:  The auto-deduction policy.  That's not

19 what's at issue here.  The defendants have explained it -- and

20 many of their filings have had to do with that policy.  What is,

21 I think, completely clear from what the defendants have told us

22 is that the auto-deduction policy will kick it -- the

23 auto-deduction of a half hour will kick in unless the employee

24 has already clocked out.  The problem is that either way, they're

25 off the clock, they're working, they're in a meal period, and

1    they are not getting paid for that time.  And the complaint here

2    is that during those meal periods, they're being called back to

3    work.  The declarations say that they worked, the declarations

4    say they were required to work, and that this was a regular

5    practice.

6            The defendant has given the Court and there is in fact

7    no evidentiary basis in the record to limit the scope of this

8    complaint of the -- the ability of opt-ins, potential opt-ins to

9    join this case, to have this complaint, to limit that on the

10   basis of position, to limit it on the basis of geography.  There

11   is no real argument to be made here that employees in one

12   position necessarily are subject to this abuse or that are not.

13           Similarly, to limit the class simply to the stores or

14   the geographic regions where we happen to have opt-ins would be

15   to give effect simply to our ability as plaintiffs' counsel

16   without discovery to reach out to people.  It would not give

17   effect to any real difference in the record between plaintiffs in

18   the regions for which we have declarations and plaintiffs who

19   work in the stores that happen to be in the other regions.  All

20   the same policies apply.  And inferentially there will be

21   employees, just as there are employees in all of -- in the 23

22   cities and 11 states for which we do have declarations,

23   inferentially there will be employees in any of the other stores

24   in states and cities in which there are Aaron's Rents facilities

25   who will come forward, if given the opportunity to join this

1   case.  And the only way to determine that is to give them the

2   opportunity to join the case.

3          Now, if there is a basis for cutting the class or

4   limiting the scope of the class either by position or by

5   geography, that will appear after discovery on a -- on the basis

6   of a developed record.  There is nothing in the current record to

7   suggest that it should be done.  There is no -- nothing in the

8   current record to suggest how it should be done, other than --

9   with respect, Your Honor, other than to arbitrarily limit the

10  class to the places where we happen to have declarants, which is

11  purely a function of our limited ability to reach people.  So,

12  we -- we are virtual --

13         THE COURT:  Well, but let me ask you this.  Mr.

14  Bartlett contends that there are -- basically there is no

15  authority out there for having a nationwide class action that

16  reaches all hourly employees.  And he particularly is focused on

17  I think the nationwide dimension of this rather than -- and the

18  combination of the nationwide dimension, plus the fact that

19  you're not just dealing with one or two positions, you're dealing

20  with all positions.  So, he says there's no authority for this.

21  And even those courts, as in the two Pennsylvania courts, that

22  did it regretted it later, you'll be sorry.  Tell me, do you have

23  a different view of what the case law is out there and is there

24  somebody else who's done this with this type of record?

25         MR. DOWNIE:  Well --

```
1              THE COURT:  I wouldn't -- because the thing is is that
2    you're perfectly correct in this circuit and in this district, it
3    is pretty much, with the type, routine under the record you've
4    given to proceed with a conditional certification.  And I
5    wouldn't have any problem with that if it was narrower.  My
6    problem is thinking about this very large undertaking without
7    more.  And I'm certainly seriously considering it, but at the
8    same time it's -- it's of great concern, because the practice
9    that you say that is inferential or believe it will be other
10   places because we found it this place, it's still -- it is not in
11   fact the official policy.  What instead is -- what you're saying
12   is that the official policy is routinely and standardly breached.
13             MR. DOWNIE:  There's two answers that I can offer you.
14             THE COURT:  And in that context, then defendant says,
15   well, you haven't even told us why that would happen.  You've
16   just made argument as to why you think it is and that's not
17   admissible.
18             MR. DOWNIE:  Well, I -- my arguments, based upon the
19   statements they make in their brief and their declarations, is
20   quite proper.
21             THE COURT:  All right.
22             MR. DOWNIE:  And we think that that does lead to the
23   inference of why this is happening in these -- to these
24   employees.
25             The -- as far as the case law, I mean, I have nothing
```

 1   more in terms of case law at my fingertips than I had -- than we
 2   had in the briefs, but we do think it's -- the -- it is perfectly
 3   within precedent to certify a nationwide class when we have
 4   declarations covering the class the way we have.  And if it can't
 5   be done on the basis of declarations from declarants in -- in 11
 6   states, it can never be done because there is nothing better that
 7   we could ever do to come into the court to ask for certification.
 8              THE COURT:  Well, you could have provided more specific
 9   declarations from those individuals.
10              MR. DOWNIE:  I appreciate that, Your Honor, and --
11   which would go if -- if that would do anything, it would go to
12   the question of the position differential here.  I don't think
13   that going into more detail with declarants from 11 states is
14   going to shed any light on whether the geographic scope of the
15   class should be beyond that.
16              THE COURT:  That's true.  But the position is part of
17   the problem.
18              MR. DOWNIE:  Well, and to address myself to that, it
19   hasn't been shown how position is a problem in the case.  All of
20   our evidence suggests that the practice we're complaining of,
21   requiring employees to come back to work during their meal
22   period, is happening to all those positions.  And the defendants
23   haven't offered any evidence to suggest that there's a reason,
24   there's a -- that there is a basis for distinguishing between one
25   position and another, why it can happen in this position and

1    can't happen in another position or why that there is -- would be

2    necessarily a difference in the incidents of this violation based

3    on position.

4           The Pennsylvania cases we cited because the courts all

5    granted conditional certification multi-position because they

6    found, as to this violation, there's no -- nobody's suggesting

7    there's really a difference between these hourly positions,

8    they're all subject to the policy.  If they have to work, there's

9    a violation.  They weren't decertified because there were

10   multiple positions.  They were decertified for other reasons that

11   are given in the opinion, but the fundamental problem wasn't that

12   there were multiple positions within the -- the certification.

13          In our case, there's -- there's five positions.  If it

14   turns out in the discovery in this case that the evidence and the

15   basis for the -- this violation occurring is different as to the

16   person who works outside the store versus the people who are

17   inside or it happen -- is different as to this position and not

18   these others, that would be a basis for the Court either to

19   divide the class into two classes or to decertify the class in

20   some respect.  There is no basis in the evidence today even to

21   believe that there is a difference from one position or another

22   in terms of the incidents of this being called back to work

23   during your meal break.

24          THE COURT:  So, is your -- your bottom line is there's

25   no basis in the record for my doing anything else except

 1    certifying a nationwide class -- collective action?

 2          MR. DOWNIE:  Well, I think that that's true.  But I

 3    also think that it's -- I think the Court's question about the

 4    manageability, which is part I think of the current question -- I

 5    mean, you asked specifically about that earlier, but it's part of

 6    this question, what if you certify a nationwide class.  We're not

 7    going to be approaching this case from the standpoint of going

 8    out and questioning hundreds of supervisors in depositions.

 9    We're going to show that it is -- all of this is driven by the

10    staffing policies and instructions that are -- and the staffing

11    pressure that is imposed upon store managers so that the store

12    managers are all placed in the position that keeping their staffs

13    lean and bringing employees -- so lean that they need the

14    employees to come back to work during their meal periods and such

15    to -- in order to cover the customers.  We're going to be

16    approaching the case from the top down and showing that this

17    practice that the individuals who opt into the case say is

18    happening to them, that it's happening for a reason that is

19    company wide.

20          And it is all -- I am obviously far beyond what

21    inferences could be drawn from the way this company is operating

22    in saying that, but it is certainly fair to say this.  Where you

23    have -- if you had a company that wasn't putting pressure on

24    store managers to work -- to have lean staffs and work people

25    even when they're supposed to be on meal breaks, you wouldn't

1  find declarants from 11 states coming forward saying -- and self

2  identifying.  We didn't -- we didn't go out and conjure these

3  witnesses.  We simply e-mailed the 200 people that we could

4  identify and asked them:  This is the allegation, is this

5  happening to you?  These declarants have self identified and said

6  yes, in all of these various places at Aaron's stores, this is

7  happening.

8         So, I -- I think that there's very good reason to

9  believe that this is happening for a top-down company-wide

10  reason.  It doesn't happen to be the auto-deduction policy.  It's

11  the staffing pressures we --

12         THE COURT:  What happens, though, then once defendant

13  wants to in fact potentially introduce evidence as to every store

14  it's not happening in, so am I going to hear evidence as to 1,100

15  stores?

16         MR. DOWNIE:  At trial?

17         THE COURT:  Yes.  Or the 600 they contend it's not

18  happening in and the 500 that you say it is happening in?

19         MR. DOWNIE:  Well, I don't see why the defendant even

20  would be allowed to introduce evidence as to stores that we don't

21  have any opt-in from.  I don't think that that would be relevant.

22  Our discovery will be focused on a few corporate witnesses.

23         We concluded a mis -- a nationwide misclassification

24  case and concluded the discovery and deposed, I believe, eight

25  individuals in total from the plaintiffs' standpoint.  The

1  defendants took 110 depositions, which were completed in six

2  months.  Schedule was set up and the -- the -- honestly, the

3  district judge thought it's a lot of depositions, but we didn't

4  object to those being taken.

5       My point -- back to my point, we will -- we will not be

6  presenting the Court with any reason why you need to hear

7  hundreds and hundreds of witnesses.  There's no reason why you

8  should in a case like this.  It's actually a very straightforward

9  case, and the question right now is simply giving other

10  individuals the opportunity to self identify and say, yes, we too

11  are being treated this way and we would like to join this case.

12       THE COURT:  What was your response, or do you have one,

13  to Mr. Bartlett's comment as to I could allow for some additional

14  discovery before determining conditional certification?  That's

15  what I construed him to be saying.

16       MR. DOWNIE:  Well, let me say what's on my mind first

17  and then maybe there's a more -- it's a bit like having your cake

18  and eating it, too.  They want us to have to come forward with no

19  discovery and then try to say our evidence is insufficient, and

20  then to say, well, perhaps you should allow them some -- some

21  discovery.  And as a practical matter, Your Honor, what that

22  means for plaintiffs and defendants is that the defendants get to

23  take the plaintiffs all around the rosy in terms -- they get to

24  depose all of our opt-ins before we have conditional

25  certification while the statute of limitations is running on the

1   claims of any other individuals simply to bring us back to the

2   question of conditional certification, when the law is in this

3   circuit and I -- as far as I know, all across the country, that

4   conditional certification isn't a question that should be viewed

5   in that manner, it should be done on the basis of allegations and

6   declarations.

7        We think that -- that we're here properly in this case

8   and that we have made a proper and sufficient showing where we

9   stand now.

10       THE COURT:  All right.

11       MR. DOWNIE:  Thank you, Your Honor.

12       MR. BARTLETT:  Your Honor, I don't want to -- I'm not

13  going to make arguments, but I do -- if I may just --

14       THE COURT:  Yes.

15       MR. BARTLETT:  -- say one thing.  Mr. Bristol -- sorry,

16  Mr. Downie is actually incorrect about the record evidence.

17  Defendant submitted affidavit for declarations that described the

18  duties performed by employees in various positions and explained

19  how that actually would impact the fundamental inquiry in the

20  case.

21       THE COURT:  Educate me as to that, because I didn't

22  quite perceive that from the affidavits.  The primary -- I

23  derived other primary points, but not that.

24       MR. BARTLETT:  Sure.  Sure.  And it relates in part to

25  the -- the evidence that pertains to how general managers or the

1    store managers of the stores run their stores as well.  And the

2    simplest example has to do with a product technician, who we

3    mentioned before, who will be out in the field and at least

4    one -- one of our general manager declarants said I require --

5    and I've got his name -- but I require that our product

6    technicians come back to the store, clock out, sit in the break

7    room, eat their meal, and then go back out to finish their work.

8              THE COURT:  Uh-huh.

9              MR. BARTLETT:  So that's one explanation of how the

10   product technician's duties would impact when, how, where they

11   take their meal break.

12             In addition, there is testimony about the -- the CAMs,

13   customer accounts managers, who are collecting money from

14   customers in the store, and they go out and do other duties on

15   the floor and then be required to come back by their manager to

16   take a break in the meal break area or in the break room or will

17   have the flexibility to go out and do what they want to based on

18   their duties.  They're not in certain stores.  They may not

19   actually be sitting at their desk the entire day versus being out

20   on the floor where they might need to have less flexibility.

21             So, there -- the evidence that we've submitted in

22   declarations does pertain to the duties to an extent and how

23   they -- particular jobs would influence the meal breaks that

24   people are being taken.

25             I'll also note that the -- the 17 or 18 declarations

1    that were submitted, even if we bump it up to the 23 the

2    plaintiffs have referenced, it's a conservative estimate that the

3    putative class nationally is 10,000.  I think it would be more

4    than that including former employees.  That's less than one-tenth

5    of one percent of the total employee population that would be

6    placed at issue by this case.

7            Even if you look at the 200 people who plaintiffs

8    contend that they've contacted and they had 20 people or 23,

9    that's roughly 10 percent of the people who were contacted and

10   given the opportunity to self identify.  There's simply such

11   small numbers compared to the -- the class that they attempt to

12   certify, compared to the 25 locations that defendants submitted

13   evidence about with the brief.

14           THE COURT:  Okay.  Well, let's take a 10 minute break

15   and then discuss -- we'll discuss how we're going to proceed.

16   I'm not telling you I'm going to in 10 minutes, but I'm going to

17   think about whether I can, and if I can't, then I'll still give

18   you some type of schedule.

19           (A recess was had.)

20           THE COURT:  Please be seated.

21           All right.  Just a few more questions.  First of all,

22   to plaintiffs' counsel, do you maintain that Aaron's

23   auto-deduction policy is per se unlawful?

24           MR. DOWNIE:  No, Your Honor.

25           THE COURT:  All right.  I just wanted to be sure that I

1   understood the position.

2           And to Aaron's counsel, do you maintain that it is

3   lawful to interrupt an employee's scheduled lunch on an

4   intermittent basis to perform work tasks?

5           MR. BARTLETT:  Yes, Your Honor.

6           THE COURT:  You do maintain that is lawful?

7           MR. BARTLETT:  It's lawful, yes, Your Honor.

8           THE COURT:  Okay.

9           MR. BARTLETT:  It's unlawful if that time pushes the

10  employee's work week above 40 hours and therefore causes the

11  employee to be underpaid overtime, but according to a case called

12  Klinghoffer -- and I'm sorry, I don't have the full name and

13  citation, but I can -- I'd be happy to submit it.

14          THE COURT:  Right.  Is that K-l-i-n-g-hoffer?

15          MR. BARTLETT:  K-l-i-n-g-h-o-f-f-e-r.

16          THE COURT:  F-f-e-r.  Okay.

17          MR. BARTLETT:  According to that case, there is no FLSA

18  claim if an employee's total hours divided into total

19  compensation in a non-overtime week equal or exceed minimum wage

20  under federal law.  Therefore, for any week when someone's time

21  was interrupted or meal break was interrupted and they performed

22  work, but they didn't push over into overtime, there would be no

23  violation.  And that's particularly important for, for instance,

24  part-time employees who putatively would be included in the

25  plaintiffs' class definition.

```
1            THE COURT:  And in Klinghoffer, what court is that?
2            MR. BARTLETT:  I'm sorry.  I'm blanking on it.
3            THE COURT:  Okay.  Is it a district court or a Court of
4   Appeals?
5            MR. BARTLETT:  It's a Court of Appeals.
6            THE COURT:  But not the Eleventh Circuit?
7            MR. BARTLETT:  It's not Eleventh Circuit, but it has
8   been -- it has been cited to with approval in at least a couple
9   of cases in this circuit.
10           THE COURT:  Okay.
11           MR. BARTLETT:  And --
12           THE COURT:  All right.  Well, I assume you'll provide
13  me -- I have another follow-up.
14           MR. BARTLETT:  Yes.
15           THE COURT:  All right.  So, if in fact it's lawful, how
16  does the -- how is an employer -- what's the employer's
17  obligation with respect to monitoring whether or not and -- that
18  is in fact not exceeding 40 hours and how does that work --
19           MR. BARTLETT:  Sure.
20           THE COURT:  -- from a practical perspective if you're
21  constantly intermittently being interrupted?
22           MR. BARTLETT:  Sure.  So, there are a couple of things
23  that go on just as a foundational premise.  It is the employer's
24  obligation to ensure that it records working time accurately.  We
25  don't dispute that at all.  That's why employees clock in at the
```

ELISE SMITH EVANS, RMR, CRR

1    beginning of the day and clock out at the end of the day.  But

2    it's incumbent upon the manager in a store to make sure that

3    employees are not working off the clock in such a way that it

4    pushes them into the overtime category.

5              And, so, that's probably one of the reasons why some

6    managers allow employees to take an hour meal break rather than a

7    half hour meal break, to ensure that there's enough time taken

8    off the clock or taken out of the working day to ensure that they

9    don't hit the 40 hour workweek.  But our declarations in a number

10   of them have explained how managers take steps to ensure that

11   employees are in fact not working off the clock.  And in --

12   several of them in fact talk about how they have observed opt-in

13   plaintiffs or declarants in cases to ensure that they're not

14   working off the clock.

15             THE COURT:  Okay.  Are there any Department of Labor

16   regulations that relate to this issue of lunch breaks and

17   intermittent breaks?

18             MR. BARTLETT:  Yes.  Yes.  And they confirm that it's

19   the employer's obligation.  But I'll also note for Your Honor

20   that the cases that I cited to earlier including the West

21   Allegheny one, the one that I can't say, and the White case out

22   of the Western District of Tennessee looked at the issue

23   involving -- they called it the burden-shifting type of argument

24   where the employer was essentially trying to shift that burden

25   over to the employee of making sure they recorded their time and

```
 1   said there's simply no reason that a lawful policy should bind a
 2   class together in that event as long as there's evidence to
 3   suggest that the employer is taking steps to ensure that
 4   employees aren't working off the clock.  And our evidence shows
 5   that and it's uncontested.
 6              THE COURT:  Okay.  Is there anything that you wanted to
 7   add in response to that last question, counsel?
 8              MR. DOWNIE:  It's not uncontested, first of all.  And
 9   the -- the whole question of what is -- what are the merits going
10   to show here, I think, is --
11              THE COURT:  I don't think that's what I was asking
12   about.  I was asking, really, about the law and I'm asking you
13   the same question, if you have anything more to add about the
14   question I posed to the defendant.
15              MR. DOWNIE:  I understood that that wasn't the Court's
16   question.  It was the answer given, though.
17              As to the law, the law that we cited in our reply brief
18   we think does address this, the employer's burden --
19              THE COURT:  Okay.  All right.
20              MR. DOWNIE:  -- what it is.
21              THE COURT:  All right.  Well, this is how I would like
22   to proceed.  I am mindful of -- that this is really a very
23   initial stage in this case and that the plaintiffs have had no
24   discovery.  And I am not really interested in getting us into a
25   sort of hybrid case of -- neither in stage one nor in stage two
```

1   because I think that has its own -- presents its own dilemmas

2   later down the road and is just not clean.  I'd rather have --

3   really follow the classic Eleventh Circuit framework of having,

4   looking at this from a conditional certification basis and then

5   really refining the class, to the extent I certify one, after

6   full discovery.

7          At the same time, I am concerned about the fact that

8   what's proposed here is that we go on into a nationwide case

9   involving all hourly employees of this company.  And I really at

10  this juncture have a quite bare bones record, certainly one

11  because of the multiple individuals making allegations or

12  declarations that might suggest that there is a real problem

13  here.  And on the other hand, these are very bare bone facts.

14         Counsel has explained what his theory is in this case,

15  and that may well be true, but of course it's not in the record.

16  I would prefer to have a somewhat more complete record before

17  proceeding with the class that would -- or collective action that

18  is nationwide involving this number of employees, because while I

19  do believe there's a way to handle this so that it isn't --

20  doesn't mean that we're having 1,100 stores having to present

21  evidence or employees from half of them or whatever it ends up

22  being, 20 percent or 15 percent, I would like -- I think that

23  it's important in terms of my management of this case to get a

24  better fix on what's happening here.

25         For that reason, I am going to give the plaintiffs

1   until May 7th to provide supplemental affidavits.  And I'm going

2   to -- the deputy clerk will give you the list of questions, but

3   I'm going to read them to you right now that I would like the

4   affidavits to respond to.  And any reply would need to be

5   submitted by May 14th, because I am -- in one way or another want

6   to get this case on the road, whatever shape it is, it's going to

7   be in, and I will rule thereafter.

8           So, the supplemental affidavits from the plaintiffs and

9   opt-ins -- and they don't have to address all these points and

10  they don't -- you don't have to have one that -- from each of the

11  opt-ins.  That's completely your discretion.  But they should

12  address at least some of these points to the extent they can.

13  One is -- the first is any lean staffing model issues which

14  counsel have argued relate to the reasons why staff members are

15  forced to work through lunch.  If they address that, I would like

16  specific facts, not just conclusions.  That's not -- I don't want

17  to just simply have them adopt your viewpoint and say I believe.

18          The second bullet was who the individual reports to.

19  And I'm just -- I typed these very fast, so it's not going to be

20  very uniform here.  But who the individual reports to and the

21  management structure at the store, and if that individual reports

22  to someone outside the store, who on the corporate level and

23  identify the position, because if they say Joe Smith, it doesn't

24  mean anything to me.

25          The specific facts as to whether and why they or the

1    individual in particular, the affiant, felt compelled to work

2    overtime, including whether or not they were (a) discouraged or

3    (b) actively prevented by management from correcting their time

4    records as to being credited for working through lunch.  I mean,

5    that's the essential inference or representation, it seems to me,

6    that's made by virtue of the complaint, but there's actually not

7    that much facts about it.  It doesn't mean they have to say on

8    January 14th this happened, on January 16th that happened,

9    January 18th, but if there are specific examples that are going

10   to help, I certainly would want some of that information.

11          This is not to be -- I don't want anyone to think that

12   this has got to be the equivalent of what the individual did --

13   would obviously offer during the course of a deposition, but I

14   think that I need to have a better understanding of the mechanics

15   of why this happens so that I can understand better why the

16   plaintiffs contend there's enough here for me to conclude that

17   there is -- this should be handled on a nationwide basis or, on

18   the other hand, I may conclude otherwise, contrary.

19          The next one was whether nonpayment for work during

20   lunch was a frequent occurrence or, instead, an isolated

21   occurrence during the course of any one year.  That will help me

22   know did this happen five times or did it happen 30 times.

23   Again, I'm not expecting, because I don't think that's -- at this

24   juncture you're going to be able during the time frames to

25   reliably provide information as to the precise number of times,

1    but I do think I -- it, again, relates to is this really a

2    routine practice or is this basically a -- a management problem

3    on -- in individual stores.

4            Any specific facts and evidence the employee is aware

5    of that suggests that the defendant's alleged FLSA violations are

6    a systemic practice either within the store she works at or on a

7    broader level within the company.  And they might not have

8    anything of that, but you for instance have provided info --

9    basically a summary statement from the individual saying I'm

10   aware this happens with other people.  And, frankly, both the

11   defendant's affidavits also say people -- I'm aware that it

12   doesn't happen based on what I observed in the lunch room.  So, I

13   can understand it either way.  But I would -- I think -- and, of

14   course, there is such thing as hearsay.

15           But on the other hand, if there's a manager who's

16   saying I'm not approving this ever and I'm told not to approve it

17   ever, or, you know, we don't look kindly on this or, you know --

18   or if you want your job, this is what it's got to be, that's --

19   that would be more relevant, certainly as to the testimony of

20   why -- you know, connecting the dots as to, well, everyone-- I've

21   worked here for five years and this is so for everybody I've

22   observed and we talk about it, that's still fine.  It's still

23   more particularized than what I have here.  But, of course, to

24   the extent -- to the greater extent it's just hearsay, I've got a

25   greater problem in terms of crediting it or giving it --

1    considering it as a strong basis for proceeding here.

2            Then for -- finally for those individuals who've been

3    employed in more than one job title, was there any difference in

4    the way their overtime/lunch period payments were handled when

5    they held different positions?  That was one way of getting at

6    this issue.  If there's no difference, that's one thing.  If --

7    there may be -- maybe it was particularly bad in one job, but it

8    was uniform.  Maybe it wasn't -- didn't happen at all in another

9    job.  But I'd like to -- again, to have some specific facts.

10           And, of course, you're welcome to identify any other

11   facts that you think are relevant from having conducted these

12   interviews.

13           MR. BARTLETT:  Your Honor?

14           THE COURT:  Yes.

15           MR. BARTLETT:  May I ask a question?  This is a little

16   bit of an unusual way to proceed, and so I just want to make sure

17   that I understand what we're looking to receive and what we may

18   be replying to and perhaps a little bit of a few parameters

19   around our reply.  I would assume that this is an instruction to

20   plaintiffs to collect declarations that are based on personal

21   knowledge and --

22           THE COURT:  Correct.

23           MR. BARTLETT:  And we would expect to see variation

24   among them and not --

25           THE COURT:  Correct.  Absolutely.

1          MR. BARTLETT:  All right.  And, then, one point of

2   clarification that would be helpful, I think, would be going to

3   the last bullet point about the job titles, there's -- you know,

4   the record is devoid at present of any evidence about the periods

5   of time when these folks held these particular positions.  And,

6   so, it would be helpful for us to understand the dates when they

7   were in them, which while it's difficult to remember obviously

8   which dates things happen, generally speaking an employee should

9   recall the dates that they were in certain positions.

10          THE COURT:  Is there any problem with your providing

11   that based on having interviewed --

12          MR. BRISTOL:  Not at all.  We'll provide that.

13          THE COURT:  Okay.  And I think for each individual it

14   would be helpful right off from the start in the affidavit to

15   indicate when they held the position so I understand who they

16   are.

17          MR. BRISTOL:  Yeah.  We'll -- we'll get --

18          THE COURT:  All right.  And if they worked at more than

19   one store, then of course clarify that as well.

20          MR. BRISTOL:  We'll do that.

21          MR. BARTLETT:  And, Your Honor, on the -- for the first

22   bullet point, maybe just -- I think that you explained it, but

23   I'm trying to -- I'm trying to think about how an employee on the

24   store floor would understand based on personal knowledge what the

25   staffing model is for the store from a corporate level.  I

```
 1   suppose that -- or I'm assuming that what you mean is if they
 2   have an understanding of a staffing model issue that caused them
 3   to --
 4            THE COURT:  That's right.  That's right.
 5            MR. BARTLETT:  Right.
 6            THE COURT:  I mean, if you're -- some of these people
 7   have been managers, so they might have some information to say --
 8   and they may be told you're going to have to perform any role
 9   whenever we have it, we don't -- and this is a -- as a result of
10   a -- this is what we're staffed to and we don't have more money
11   than that.  I'm just -- that's purely like a hypothesis; not that
12   that's what I necessarily believe at all.  But they've argued
13   something and I'd like to understand are there fact -- are there
14   any facts that lead them to make that argument at this point.  I
15   mean, obviously we see the same concern and contentions in the
16   hospital cases in Pennsylvania, and, you know, the variety of
17   context we all see in public life at this point that this
18   happens.  Whether it's happening at Aaron's, I have no idea
19   whatsoever, and I don't know if it's in any way -- if it is, if
20   it's connected to this or not.  But to the extent there are
21   facts, I'd like to -- that they have possession of, I'd like to
22   see them because, again, it relates to the question of is this
23   something that is systemic rather than just particular to a
24   store.
25            MR. BARTLETT:  Sure.
```

1           THE COURT:  Although it might be only particular to a

2    store.  I -- as well.

3           MR. BARTLETT:  I have just a couple more questions, I

4    promise, left for you.

5           THE COURT:  That's all right.

6           MR. BARTLETT:  So, the submission will -- does the

7    Court anticipate seeing argument with the submission or simply --

8           THE COURT:  No.

9           MR. BARTLETT:  -- declarations?

10          THE COURT:  Just the -- I think there's been plenty of

11   argument and opportunity for argument.  I think the only thing --

12   I mean, I am -- I can imagine if you're going to submit all of

13   that, if you want to provide a -- no more than a five-page

14   summary of what you've -- the facts that you've -- you're

15   presenting and that you've sort of assimilated, that would be

16   fine.  I mean, just as people respectively said there were, you

17   know, this number of people from this -- this state, this number

18   of people from 23 states or whatever, that sort of summary, or 20

19   individuals said X, 5 said Y.

20          MR. BARTLETT:  Okay.  And then the --

21          THE COURT:  And, then, you could put a parentheses as

22   to those so that I know who we've got.

23          MR. BARTLETT:  And the reply that you would expect from

24   the defendant, would that be declaration form as well?

25          THE COURT:  Well, if you wanted to do a declaration,

1   you could do that in response, but you also simply could have a

2   five-page commentary instead.  But that wasn't really about

3   argument, was really just discussion of what we had in the

4   context of your other argument.

5               MR. BARTLETT:  Thank you.

6               THE COURT:  All right.  Any questions from plaintiffs'

7   counsel?

8               MR. BRISTOL:  No, thank you, Your Honor.

9               THE COURT:  All right.  When -- I would -- I guess I

10  would appreciate your also in the meantime just chatting between

11  yourselves about this question of an independent -- whether

12  you're going to -- it -- I don't want to jump the boat.  On the

13  other hand, I don't want to have to try to get everyone back

14  again together to discuss this because the first issue is the

15  notice issue, and the note -- the joint notice was basically

16  fine.  I had something I wanted to get bolded, but that's minor.

17              So, in the event I allow any form of the -- of the

18  collective action to proceed, I would like to understand whether

19  the parties agree for the -- on the plaintiffs' distributing it

20  or not.  And if not, can you agree on an administrator and who's

21  paying for it?  And if you can't agree that far, do you want me

22  to decide on an administrator and who's paying for it?  All

23  right.

24              MR. BARTLETT:  Very good, Your Honor.

25              THE COURT:  So, by the time I -- by the time of the

 1  defendant's response, I would like you to have a joint letter

 2  that one of you represents this is the situation, and even if you

 3  have a disagreement, that you summarize what the disagreement --

 4  what the status of the parties' respective positions are.  So,

 5  that would be due on the 14th as well.

 6          Any questions about that?  Okay.  Well, I'm going to

 7  defer approving the Joint Preliminary Report and Discovery Plan

 8  until we figure out how we're proceeding here, and so then I

 9  can -- I'll know what -- how long the discovery period should be

10  at that point based on what I'm going to approve or not.

11          MR. BRISTOL:  Your Honor, we've been served with

12  discovery already by defendants.  Could we get an agreement that

13  at least be stayed while we're spending our efforts on these

14  supplemental filings?

15          THE COURT:  I think that sounds reasonable under the

16  circumstances.  Is the discovery directed towards the 20 -- the

17  individuals thus far or is it based on a -- the assumption of a

18  nationwide action?

19          MR. BRISTOL:  It's the individuals thus far.

20          THE COURT:  All right.  So, why don't we say this, is

21  that the -- the time will start ticking on the 14th.

22          MR. BARTLETT:  Your Honor, is that the -- the time from

23  the service date or treating the 14th as the service date?

24          THE COURT:  I'm going to keep the 30 days as starting

25  on the 14th with day one as being May the 14th.

1          MR. BARTLETT:  Okay.

2          THE COURT:  All right?  Have you served the defendants

3   with any discovery?

4          MR. BRISTOL:  No, we have not, Your Honor.

5          THE COURT:  All right.  All right.  Any other

6   questions?

7          MR. BARTLETT:  No, Your Honor.

8          MR. DOWNIE:  No.

9          MR. BRISTOL:  No, Your Honor.

10         THE COURT:  All right.  Very good.  Look forward to

11  seeing the rest of the materials.

12         MR. BARTLETT:  Thank you.

13         (End of proceedings.)

14                              *****

15

16

17

18

19

20

21

22

23

24

25

```
1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF GEORGIA

3   CERTIFICATE OF REPORTER

4

5

6          I do hereby certify that the foregoing pages are a true

7   and correct transcript of the proceedings taken down by me in the

8   case aforesaid.

9          This the 24th day of April, 2012.

10

11

12
                              _____
13                            ELISE SMITH EVANS, RMR, CRR
                              OFFICIAL COURT REPORTER
14

15

16

17

18

19

20

21

22

23

24

25
```